**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 24, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

_____

BRITTNEY BROWN,

     Plaintiff - Appellant,

v.

ROGER FLOWERS,

     Defendant.

------------------------------

ASSOCIATION OF COUNTY
COMMISSIONERS OF OKLAHOMA
SELF-INSURED GROUP,

     Garnishee - Appellee.

No. 25-7009
(D.C. No. 6:17-CV-00347-EFM)
(E.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **TYMKOVICH**, **PHILLIPS**, and **McHUGH**, Circuit Judges.

_____

A jury awarded Brittney Brown $75,000 in damages in her lawsuit

against former Pontotoc County jailer Roger Flowers after finding that he

violated her constitutional rights. After Flowers failed to pay the judgment,

Brown sought to enforce it against Pontotoc County, which had a Liability

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be
cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

Coverage Agreement with the Association of County Commissioners of Oklahoma Self-Insured Group. So Brown brought a garnishment action against the Group, asserting that the Group must indemnify Flowers for the judgment and related costs and fees under the Agreement. But the Group objected, asserting that the Agreement did not cover Flowers's conduct: nonconsensual sex with a pretrial detainee.

The district court agreed with the Group and denied Brown's motion to enforce a writ of garnishment. Brown timely appealed.

Brown challenges the district court's decision on three grounds. First, she argues that the Agreement covers Flowers's conduct and none of the Agreement's exclusions apply. Second, she contends that the court erred in resolving a fact question about the Agreement's coverage. And third, she argues that the court should have applied the reasonable-expectations doctrine to avoid rendering illusory the Agreement's coverage for sexual-abuse claims.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. The Agreement did not cover Flowers's conduct. The district court did not inappropriately decide a jury question. And the reasonable-expectations doctrine does not apply.

## BACKGROUND

Oklahoma garnishment procedures govern this garnishment action. *See* Fed. R. Civ. P. 69(a)(1) (proceedings "in aid of judgment . . . must accord with the procedure of the state where the court is located"). Under Oklahoma law, a

2

"garnishment proceeding is an action separate from the action seeking to establish liability." *Fleeger v. Gen. Ins. Co. of Am.*, 453 F.2d 530, 532 (10th Cir. 1972). Because the underlying liability action informs our decision on the garnishment action, we detail both proceedings below.

## I.    Factual Background of the Liability Action

We have considered the underlying liability action twice on appeal and draw from those decisions for the case background. *See Brown v. Flowers*, 974 F.3d 1178 (10th Cir. 2020) (*Brown I*); *Brown v. Flowers*, No. 23-7006, 2023 WL 6861761 (10th Cir. Oct. 18, 2023) (*Brown II*).

### A.    Underlying Conduct

In *Brown I*, we described the conduct at issue in the liability action:

> In March 2016, Brown was a pretrial detainee at the Pontotoc County Justice Center, where Flowers worked as a jailer. Flowers could communicate with residents of the pod where Brown was housed over an intercom and see them over video. On March 20, 2016, Flowers used the intercom system to tell Brown to come see him in the control tower, telling her "to hurry." Brown felt that she had to comply with Flowers's orders because she was in jail and "had to do what she was told." She felt that jailers "have control of your whole entire life," including "what you get, what you don't get, when you get to do anything, everything." After she entered the control tower, Flowers said to Brown, "let me see your titties" and "he lifted Brown's shirt up." Flowers then began having sex with Brown. Brown began crying, which caused Flowers to turn Brown around so that he could penetrate her from behind. Brown explained that she did not physically resist because Flowers was "a guard and she was an inmate" and so if she used physical force to resist Flowers, that resistance could result in charges against her.

> After the incident, Flowers gave Brown cigarettes. Brown requested a "rape kit" from the jail nurse, and she told her sister, biological mother, and adoptive mother that she was "raped." A

3

similar incident occurred a week later. Flowers later pleaded guilty in Oklahoma state court to two counts of second-degree rape under an Oklahoma statute that defines sex between a guard and a prisoner as rape.

974 F.3d at 1180–81 (citation modified).

### B.    Complaint & Summary Judgment

In 2017, Brown sued Flowers under 42 U.S.C. § 1983, alleging "that [he] raped her while in custody in violation of her constitutional rights." *Id.* at 1181. She also sued Sheriff John Christian and jail administrator Mike Sinnett. Brown sought both actual and punitive damages.

Flowers, Christian, and Sinnett each moved for summary judgment. The district court denied Flowers's motion for summary judgment and qualified immunity on Brown's § 1983 claim. But it granted his motion for summary judgment on her claim for punitive damages. The court also granted Christian's and Sinnett's motions for summary judgment on all claims against them.

### C.    First Appeal (*Brown I*)

Flowers appealed the denial of summary judgment and qualified immunity on Brown's § 1983 claim. *Id.* at 1180. He argued that the district court erred in finding a genuine issue of material fact about whether he violated Brown's clearly established rights. *See id.* at 1180–81, 1183.

Assuming all facts in Brown's favor, we disagreed with Flowers and affirmed. *Id.* at 1180, 1182. On the violation of Brown's rights, we explained that "we treat sexual abuse of prisoners as a species of excessive-force claim."

4

*Id.* at 1182 (citation modified). Because Brown was a pretrial detainee, she had to show only that Flowers's conduct "was objectively harmful enough to establish a constitutional violation." *Id.* at 1183 (citation omitted). We noted that "nonconsensual, coerced sex" met that standard. *Id.*

The district court had ruled that there were jury questions about whether Flowers had coerced Brown into having sex. *Id.* Though Flowers challenged this ruling, we held that we lacked jurisdiction to reconsider the district court's factual findings on this point. *Id.* at 1183–84. So we affirmed the district court's ruling that reasonable jurors could find that Flowers violated Brown's constitutional rights by coercing her into sex. *See id.* at 1184.

As for whether Brown's rights were clearly established, we explained that "[w]e have long held that nonconsensual, coerced sex between a jailer and an inmate violates the Constitution." *Id.* at 1186. So for qualified-immunity purposes, we "conclude[d] that Flowers violated Brown's [clearly established] constitutional right to be free from sexual abuse when he coerced Brown into having sex without her consent." *Id.* at 1188.

**D.    Trial**

Brown and Flowers proceeded to trial. We highlight relevant portions of the pretrial order and jury instructions below.

**1.    Pretrial Order**

According to the pretrial order, Brown contended that Flowers "rape[d]" her and that his actions involved coercion and force. App. vol. I at 40–41. In

5

response, Flowers asserted that Brown consented to the sexual activity. In his view, "whether Flowers acted in a coercive manner [was] the central issue to be tried." *Id.* at 41. In fact, the pretrial order identified the coercion question as a key fact issue for trial.

The parties also stipulated that (1) "[a]t all times relevant, [Flowers] was acting under color of law"; (2) Brown was a pretrial detainee in the Pontotoc County Justice Center; (3) "[t]he subject incidents involving" Brown and Flowers occurred on March 23 and March 30, 2016; (4) Flowers was a jailer at the Justice Center; and (5) "Flowers pleaded guilty to two counts of violations of Okla. Stat. tit. 21, § 1116 regarding" Brown.[1] *Id.* at 42–43.

### 2.    Jury Instructions

The jury instructions identified Brown's claim as whether "Flowers raped her on two separate occasions" when she was a pretrial detainee. *Id.* at 56. The district court identified the constitutional right at issue as the right of "a pretrial detainee to be secure in her bodily integrity and free from sexual intercourse imposed upon her by jailers through coercion while held in custody." *Id.* at 66. The court instructed that, to establish a constitutional violation, Brown had to show that Flowers's conduct was objectively harmful. To determine whether Flowers's conduct met that standard, the court told the jury to

---

[1] Section 1116 states that "[r]ape in the second degree is a felony" in Oklahoma. Okla. Stat. tit. 21, § 1116.

> consider the nature of the force used by [Flowers]. In this case, if you find that [Flowers] coerced [Brown] to engage in sexual intercourse with him, this is sufficient to show an objective harm that violated [Brown's] Fourteenth Amendment rights. Alternatively, if you find instead that [Flowers] and [Brown] engaged in consensual sexual intercourse, you may not find that [Brown's] Fourteenth Amendment rights were violated.

*Id.* The court also explained that coercion could be a non-physical pressure or influence "designed to manipulate [Brown] into agreeing to sex." *Id.* at 67.

Finally, the court addressed Flowers's state-law convictions for second-degree rape "on account of the two instances of sexual intercourse with [Brown]." *Id.* at 68. It stated that, in Oklahoma, "[a]ny sexual intercourse that occurs between a jailer and a pretrial detainee is considered at least second-degree rape." *Id.* So the court explained that though Brown's § 1983 claim "involves consideration of whether or not [Flowers] coerced [Brown] to have sex with him," his criminal charges did not. *Id.*

### 3.   Jury Trial

After a four-day trial, the jury found in Brown's favor and awarded her $75,000 in damages plus post-judgment interest.

### E.   Second Appeal (*Brown II*)

Brown appealed next, challenging the district court's grant of summary judgment on (1) her claim for punitive damages against Flowers and (2) her § 1983 claims against Christian and Sinnett. *Brown II*, 2023 WL 6861761, at *1. We affirmed, concluding that Brown failed to introduce sufficient evidence

7

supporting either punitive damages or her claims against Christian and Sinnett. *Id.* at *6–12.

## II.     Factual Background of the Garnishment Action

The Association of County Commissioners of Oklahoma Self-Insured Group, formed under the Interlocal Cooperation Act, Okla. Stat. tit. 74, § 1001, insures participating counties under the Oklahoma Governmental Tort Claims Act, Okla. Stat. tit. 51, § 169. The Group issued a Liability Coverage Agreement to Pontotoc County. Under that Agreement—and under a full reservation of rights—the Group defended Flowers during the liability action.

Several of the Agreement's provisions lie at the heart of this appeal. We detail them below.

### A.     Liability Coverage Agreement

The Agreement obligates the Group to pay for "those sums the Plan Member becomes legally obligated to pay as Damages . . . because of Bodily Injury."[2] App. vol. I at 131. The Law Enforcement Liability portion of the Agreement also covers Bodily Injury damages caused by law enforcement.

### 1.     Who Is Covered

The Agreement applies only to "Plan Members." County employees can be—but are not always—Plan Members under the Agreement. Employees of the "Named Plan Member," or the counties party to the Agreement, are considered

---

[2] The term "Damages" includes a monetary judgment. App. vol. I at 126.

"additional Plan Members" only "while performing and acting within the Scope of Duties for a Named Plan Member." App. vol. I at 106.

The Agreement defines "Scope of Duties" as "performance by an Employee acting in good faith within the duties of the Employee's office or employment." *Id.* at 129. The definition expressly does not include (1) "any dishonest, criminal, fraudulent, bad faith, reckless, wanton or malicious act"; and (2) "any act that results in a Claim of alleged Sexual Abuse," because such acts "are not fairly and naturally incident to any Plan Member's business." *Id.*

The Agreement also defines "Sexual Abuse" as "any actual, attempted or alleged sexual act by any person . . . which causes physical and/or mental injuries to anyone." *Id.* It then lists eleven examples of Sexual Abuse claims, including claims of "sexual assault," "sexual advances of any kind (welcome and unwelcome)," "rape," and "any other sexual act or alleged sexual injury." *Id.* at 129–30.

### 2. Exclusions

The Agreement excludes Plan Members from coverage in some cases. Relevant here, several of the Agreement's exclusions eliminate liability coverage for losses[3] arising from criminal acts or acts outside the employee's Scope of Duties.

---

[3] The Agreement defines "Loss" to include "sums which a . . . Plan Member is legally obligated to pay as Damages for any Claim arising out of the liability coverages" in the Agreement. App. vol. I at 127.

Next, the Agreement excludes liability coverage for claims[4] related to "any Sexual Abuse if a final adjudication establishes or the Plan Member admits (a) that the Plan Member participated in the Sexual Abuse or (b) if the Sexual Abuse was ongoing, that the Plan Member had knowledge of the Sexual Abuse and failed to take reasonable action to stop" it. *Id.* at 108, 115.

Lastly, the Law Enforcement Liability portion of the Agreement excludes coverage for claims relating to (a) "any criminal, dishonest, fraudulent, bad faith, reckless, malicious, wanton or intentional act"; and (b) "any conduct in which the Plan Member deliberately violated or had knowledge of or consented to the violation of any federal, state or local" law. *Id.* at 138.

## B.    Flowers's Defense

In March 2018, the Group sent Flowers a letter addressing the Agreement's coverage for Brown's claims. The letter identified relevant liability limits and exclusions. It also stated that because Flowers pleaded guilty to rape, "no coverage will be available to you under the Liability Coverage Agreement." *Id.* at 160. The letter warned that "[a]ny judgment rendered against you will be your responsibility to pay." *Id.* Still, the Group kept defending Flowers.

---

[4] The Agreement defines "Claim" as "any written or oral demand or lawsuit to recover money" for a Named Plan Member's act or omission. App. vol. I at 126.

10

After trial, Flowers asked the Group to pay the $75,000 judgment against him. The Group denied the request. It reminded Flowers that the March 2018 letter explained that the Group would deny coverage based on his guilty plea and several of the Agreement's exclusions. The Group noted that it defended him through trial only as a courtesy.

## III.    Procedural History

### A.    Writ of Garnishment

Over a year later, Flowers still had not paid the judgment.[5] So Brown sought a writ of garnishment against the Group. *See* 28 U.S.C. § 1651(a) (courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law"); Fed. R. Civ. P. 69(a)(1) (proceedings "in aid of judgment . . . must accord with the procedure of the state where the court is located"); *see generally* Okla. Stat. tit. 12, §§ 1170–96 (Oklahoma garnishment procedures).

In her garnishment application, Brown claimed that the Agreement covered Flowers's conduct and that the Group must indemnify him. The Group disagreed, objecting to coverage for the reasons identified in Flowers's coverage-denial letter.

Then Brown requested a trial on the coverage issue. The court directed Brown to file a motion for enforcement of garnishment instead.

---

[5] At this point, Flowers owed Brown almost $215,000 after costs, fees, and interest.

In her motion, Brown argued that Flowers was a Plan Member because the jury in the liability action never found that he acted outside the scope of his duties. Brown also argued that the Group had to indemnify Flowers for her damages, even if Flowers acted outside his duties. In support, she noted that the Agreement obligated the Group to pay "Damages . . . because of Bodily Injury." *See* App. vol. I at 131. And the Agreement's definition for "Bodily Injury" did not limit coverage to injuries caused by employees acting within the Scope of Duties.[6]

Brown also asserted that none of the Agreement's exclusions applied. She argued that the exclusion for criminal or malicious conduct could not apply because the jury in the liability action never found any such conduct. In her view, the only issue the jury decided was "that Flowers' use of force was objectively unreasonable." *Id.* at 179. Plus, because *Brown II* affirmed summary judgment against her on her punitive-damages claim, she asserted that "these types of misconduct . . . cannot possibly be found in the record" under "the law of the case." *Id.* And lastly, Brown claimed that the sexual-abuse

---

[6] The Agreement defines "Bodily Injury" as "bodily injury, mental injury, mental anguish, sickness or disease sustained by a person, including death . . . and also includes care and loss of services." App. vol. I at 126. The term "Personal Injury," on the other hand, includes certain "mental anguish, humiliation, shock and fright caused by the acts of Plan Members, or *Employees while acting in the Scope of Duties*." *Id.* at 128 (emphasis added). Brown highlighted that the Bodily Injury definition lacked the Personal Injury definition's limiting language.

exclusion did not apply, either, because Flowers never admitted his liability and no final adjudication established that he participated in sexual abuse.

The Group opposed the motion, arguing that the Agreement did not cover Flowers's actions because they were outside the Scope of Duties and multiple exclusions applied.

### B.    Writ Denial

The district court denied Brown's motion. The court held that Flowers was not a Plan Member under the Agreement because he acted outside the Scope of Duties. The court explained that to fall within the Scope of Duties, an employee must act in good faith within the duties of his office. And the court observed that "Brown cannot seriously argue that sexual intercourse with an inmate is a good faith act within Flowers' duties as a jailer." *Id.* at 297. Thus, it held that—because Flowers was not acting within his Scope of Duties when he had sex with Brown—he was not covered by the Agreement.[7]

For the same reason, the court concluded that the Agreement's coverage for Bodily Injury damages did not apply. Because Flowers was not a Plan Member, none of the Agreement's provisions applied to him, including its coverage for Bodily Injury damages.

---

[7] Brown contends that the Group never argued that Flowers wasn't a Plan Member because he acted outside the Scope of Duties; she asserts that only the district court "made th[at] argument." Reply Br. at 2. We disagree. The Group argued this point in its response to her motion to enforce garnishment.

13

Finally, the district court held that, even if Flowers were a Plan Member, the sexual-abuse exclusion applied. The court ruled that the liability action's verdict and judgment constituted a "final adjudication" that Flowers participated in Sexual Abuse as defined in the Agreement. The court reasoned that by finding for Brown, the jury concluded "that Flowers coerced Brown into having sexual intercourse." *Id.* at 300. So the court held that the sexual-abuse exclusion eliminated coverage for Flowers's conduct.[8]

Brown now appeals. First, she argues that the district court erred in finding her excessive-force claim outside the Agreement's scope of coverage. Second, she contends that the court improperly decided a jury question when it held that Flowers acted outside the Scope of Duties. And third, she argues that the court should have applied the reasonable-expectations doctrine to find coverage for her damages. We reject each challenge in turn.

## JURISDICTION

Brown appealed from the district court's order denying her motion to enforce garnishment. But that order did not dismiss the Group or the garnishment action. Nor did the district court enter judgment. As a result, we directed the parties to provide supplemental briefing on our appellate jurisdiction.

---

[8] The court declined to consider (1) whether Flowers's guilty plea rendered his conduct criminal and so outside the Scope of Duties for that reason, too, and (2) whether his plea counted as an admission under the sexual-abuse exclusion.

Both parties argue that the order denying Brown's motion to enforce garnishment was a "final decision[]" because it ended the garnishment proceedings on the merits. *See* 28 U.S.C. § 1291; *Conrad v. Phone Directories Co.*, 585 F.3d 1376, 1380 (10th Cir. 2009) (holding that a final decision "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment" (citation omitted)). And the parties agree that the court's order disposed of the garnishment action's sole issue—whether the Group must indemnify Flowers.

We agree with the parties and conclude that the district court's order is a final decision under 28 U.S.C. § 1291. After the court's order denying the motion to enforce garnishment, there is "nothing [left] for the [district] court to do but execute the judgment." *Conrad*, 585 F.3d at 1380 (citation omitted). So we exercise jurisdiction under 28 U.S.C. § 1291.

## STANDARD OF REVIEW

The parties agree that we should treat the denial of Brown's motion to enforce garnishment like a summary-judgment decision. We review de novo a decision to grant or deny summary judgment. *See GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200 (10th Cir. 2022); *Adamscheck v. Am. Fam. Mut. Ins.*, 818 F.3d 576, 582 (10th Cir. 2016).

Courts should grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the

15

initial burden of proving that there are no genuine issues of material fact. *GeoMetWatch Corp.*, 38 F.4th at 1200. On doing so, the burden shifts to the nonmovant to "present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor." *Id.* (citation omitted). We view the evidence and draw all reasonable inferences in the light most favorable to the nonmovant. *Id.*

**DISCUSSION**

In a garnishment action, "the judgment creditor stands in the shoes of the judgment debtor to enforce a liability owed to the latter by a third party—the garnishee." *Culie v. Arnett*, 765 P.2d 1203, 1205 (Okla. 1988). "The former may claim no greater rights against the garnishee than the latter himself possesses." *Id.*

Here, Brown (the judgment creditor) argues that the district court erred in ruling that the Group (the garnishee) need not indemnify Flowers (the judgment debtor) under the Group's Liability Coverage Agreement with Pontotoc County. Because Brown "may claim no greater rights" than Flowers possesses, we examine Flowers's coverage under the Agreement. *See id.*

Under Oklahoma contract law,[9] "[p]arties are free to contract for insurance that covers whatever risks they see fit, and they will be bound by the terms of the contract." *Crown Energy Co. v. Mid-Continent Cas. Co.*, 511 P.3d

---

[9] The parties do not dispute that Oklahoma law controls the Agreement.

16

1064, 1068 (Okla. 2022). Courts should "effectuate the intent of the parties as expressed in the terms of the contract"; we may not "rewrite" the contract's terms. *Id.* When reviewing typical insurance contracts, Oklahoma courts employ several interpretive rules:

> 1) ambiguities are construed most strongly against the insurer; 2) in cases of doubt, words of inclusion are liberally applied in favor of the insured and words of exclusion are strictly construed against the insurer; 3) an interpretation which makes a contract fair and reasonable is selected over that which yields a harsh or unreasonable result; 4) insurance contracts are construed to give effect to the parties' intentions; 5) the scope of an agreement is not determined in a vacuum, but instead with reference to extrinsic circumstances; and 6) words are given effect according to their ordinary or popular meaning.

*Max True Plastering Co. v. U.S. Fid. & Guar. Co.*, 912 P.2d 861, 865 (Okla. 1996). And at bottom, if an insurer wants to limit its liability, "it must employ language that clearly and distinctly reveals its stated purpose." *Broom v. Wilson Paving & Excavating, Inc.*, 356 P.3d 617, 627 (Okla. 2015) (citation omitted).

Importantly, though, the Agreement differs from typical insurance contracts. The Agreement between the Group and Pontotoc County is "a governmental cooperative insurance plan," which "pools self-insured reserves, claims and losses of" participating counties. *See Bd. of Cnty. Comm'rs of Del. Cnty. v. Ass'n of Cnty. Comm'rs of Okla. Self-Ins. Grp.*, 339 P.3d 866, 868 (Okla. 2014). Such plans "share[] little in common with commercial enterprises that sell insurance for a profit to their shareholders." *Id.* For one, "[t]he contracting parties have substantially more freedom to contract" than typical

17

insureds. *Id.* Plus, "[a]ll the contracting parties in a governmental cooperative insurance plan have equal interests in enforcing the contracts protecting the pooling of their resources." *Id.*

With these principles in mind, we turn to the Agreement and whether it covers Flowers's conduct.

## I.    Liability Coverage

The Agreement covers county employees only when they are "performing and acting within the Scope of Duties for a Named Plan Member." App. vol. I at 106. "Scope of Duties" means "performance by an Employee acting in good faith within the duties of the Employee's office or employment." *Id.* at 129. The district court concluded that Flowers's conduct fell outside this definition.

We agree. The Agreement does not define "good faith." But the "ordinary or popular meaning" of the term supports that nonconsensual sex with a pretrial detainee falls outside its scope. *See Max True Plastering Co.*, 912 P.2d at 865. Black's Law Dictionary defines "good faith" as "[a] state of mind consisting in (1) honesty in belief or purpose, [or] (2) faithfulness to one's duty or obligation." *Good Faith*, Black's Law Dictionary (10th ed. 2014). Similarly, Merriam-Webster defines "good faith" as "honesty or lawfulness of purpose." *Good Faith*, Merriam-Webster, https://www.merriam-webster.com/dictionary/good%20faith (last visited Dec. 2, 2025).

Brown has not shown that Flowers acted honestly or lawfully by coercing her into sex. Consider the jury's verdict in the underlying liability action. The

18

court instructed the jury to find for Brown only if Flowers coerced her into having sex. To make that finding, the jury had to conclude that Flowers exerted "pressure or influence . . . designed to manipulate [Brown] into agreeing to sex." App. vol. I at 67. No reasonable juror could conclude that, when he manipulated Brown into having sex, Flowers acted honestly or with lawfulness of purpose within his duties as a jailer. So like the district court, we conclude that Flowers acted outside the Scope of Duties when he had sex with Brown.

We reject Brown's attempts to convince us otherwise. First, she argues that the jury never decided that Flowers coerced her into sex. Instead, she contends that the jury decided only that Flowers used objectively unreasonable force.

Both *Brown I* and the record rebut this contention. We concluded in *Brown I* that Brown created a jury question about whether "Flowers violated [her] constitutional right to be free from sexual abuse when he *coerced Brown into having sex* without her consent." 974 F.3d at 1188 (emphasis added). And we reiterated that prisoner sexual-abuse claims "requir[e] at least some form of coercion . . . by the prisoner's custodians." *Id.* at 1185 (citation omitted).

The record also reflects that a central issue at trial was "[w]hether Flowers coerced or forced [Brown] to have sexual intercourse with him in violation of her constitutional rights." App. vol. I at 43. Indeed, the jury instructions indicated that—to find Flowers's conduct objectively unreasonable in violation of the constitution—the jury must find that Flowers "coerced

19

[Brown] to engage in sexual intercourse with him." *Id.* at 66. So by returning a verdict for Brown, the jury necessarily decided that Flowers coerced Brown into having sex.

Second, Brown points to the parties' stipulation that Flowers acted under color of law. In Brown's view, because Flowers acted under color of law, he also acted within the Scope of Duties when he used excessive force against her.

This argument misses the mark. Scope of Duties under the Agreement and color of law under § 1983 are distinct standards. Under color of law means that a § 1983 defendant "exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Jojola v. Chavez*, 55 F.3d 488, 492–93 (10th Cir. 1995) (citation modified). For an action to be under color of law, there must be a "a real nexus between the defendant's conduct and the defendant's badge of state authority." *Id.* at 494 (citation modified).

On the other hand, the Agreement's definition of Scope of Duties has little to do with Flowers's state-law authority. Instead, to be within his Scope of Duties, Flowers's actions had to be in good-faith performance of his duties. Section 1983's "under color of law" standard has no such requirement.

Third, Brown relies on *Maryland Casualty Co. v. Farmers Alliance Mutual Insurance*, 566 P.2d 168 (Okla. Civ. App. 1977), to argue that Flowers's conduct fell within the Scope of Duties. But that case is distinguishable.

20

There, a carpenter working on a new home caused an explosion by lighting a cigarette after turning on a propane tank. *Id.* at 169. A subsequent garnishment action against the carpenter's insurance carrier turned on whether the carpenter acted within his scope of employment when he caused the explosion. *Id.* The court held that because the employee "was on the premises to perform his trade" and "to make a profit," the damage occurred within the scope of his employment. *Id.* at 169–70. The court also concluded that "damages caused while [an employee] was smoking [arise] out of the course of his employment," in part because "employers know [smoking] is a common habit of workmen." *Id.* at 170 (citation omitted).

Brown argues that—like smoking in *Maryland Casualty*—excessive force is an expected risk in the law-enforcement context, suggesting that Flowers's use of excessive force fell within his duties as a jailer. But even if excessive force is an expected risk, the Group and the counties could contract not to cover that conduct. *See Bd. of Cnty. Comm'rs of Del. Cnty.*, 339 P.3d at 868 (explaining that parties to a governmental cooperative insurance plan "have substantially more freedom to contract" than parties to traditional insurance policies). Even Brown concedes that the Group and counties "enjoyed a relationship which gave them freedom to contract as they pleased for the coverages at issue." Op. Br. at 9. And unlike the policy in *Maryland Casualty*, the Agreement here limited Scope of Duties to only those actions taken in good-faith performance of an employee's duties.

21

All in all, under the Agreement's Scope of Duties definition, no reasonable juror could find that Flowers acted "in good faith within the duties of [his] office or employment" when he coerced Brown into having sex. *See* App. vol. I at 129. As acknowledged in the liability action's pretrial order, "standards of decency would prohibit any felony and any sexual act against a pre-trial detainee by a jailer."[10] *Id.* at 41. And so, the district court did not err in ruling that Flowers acted outside the Scope of Duties and thus was not a Plan Member under the Agreement.[11]

Yet Brown asserts that even if an employee acts outside the Scope of Duties, the Group still must indemnify the employee for Bodily Injury damages. She emphasizes that the Bodily Injury definition encompasses injuries beyond those caused by an employee acting within the Scope of Duties.

---

[10] The parties also stipulated in the liability action that Flowers pleaded guilty to two counts of rape for the same conduct underlying the liability action. Flowers's conduct being criminal also supports that he acted outside the Scope of Duties when he had sex with Brown.

[11] Brown insists that the Group acknowledged Flowers was a Plan Member by defending him in the liability action. The record belies this argument. From the start, the Group told Flowers that it would defend him only under a full reservation of rights. And it repeatedly explained that he lacked coverage under the Agreement. Brown similarly argues that the Group conceded that Flowers was a Plan Member by "admitt[ing] . . . that the [Agreement] applies to Flowers subject to the common provisions, exclusions, and definitions." Reply Br. at 5. But the Group did no such thing. The Group stated that—because Pontotoc County was a Named Plan Member—"the terms of the Coverage Agreement *may* apply to Flowers, subject to the common provisions, exclusions, conditions, and definitions of [the] same." App. vol. I at 88 (emphasis added).

The district court rejected this argument, concluding that it incorrectly "presupposes that Flowers is a Plan Member." *Id.* at 298. We agree. It makes no difference that the Bodily Injury definition does not reference the Scope of Duties. That's because the Agreement indemnifies only *Plan Members* for Bodily Injury damages. And again, Flowers was not a Plan Member. So none of the Agreement's provisions applied to him or his actions.

In sum, Flowers did not act in good faith within his duties when he had nonconsensual sex with Brown. Flowers's conduct fell outside the Scope of Duties and so excluded him from coverage.[12]

## II.    Jury Question

Next, Brown argues that the district court decided a jury question when it ruled that Flowers acted outside the Scope of Duties. She insists that the jury in the liability action never found that Flowers acted outside his Scope of Duties. And she argues that the scope-of-duties question is a fact issue that must go to a jury.

We see no error in the district court's ruling. Even assuming this was a jury question, the jury in the liability action implicitly answered it by returning a verdict for Brown. As discussed, the jury found that Flowers coerced Brown into having sex, which removed his conduct from the Scope of Duties. So on

---

[12] Because we conclude that Flowers was not a Plan Member, we need not consider whether any of the Agreement's exclusions apply.

23

this record, Brown never created a "genuine dispute" about whether Flowers acted within the Scope of Duties when he coerced Brown into having sex. *See* Fed. R. Civ. P. 56(a); *see also Saber Acceptance Co. v. Curran*, 352 P.3d 716, 718 (Okla. Civ. App. 2014) (holding that courts may decide garnishment actions on summary judgment). The court did not err by deciding this issue as a matter of law.

## III.   Reasonable-Expectations Doctrine

Brown argues that, under the district court's interpretation of the Agreement, any purported coverage for sexual-abuse claims is "illusory." So she suggests that the court erred in failing to apply the reasonable-expectations doctrine to find coverage for such claims.

The reasonable-expectations doctrine is "an interpretative tool to aid courts in discerning the intention of the parties bound by adhesion contracts." *Max True Plastering Co.*, 912 P.2d at 864. If the insurer "creates a reasonable expectation of coverage in the insured which is not supported by policy language, the expectation will prevail over the language of the policy." *Id.* We look objectively at the policy's language "to determine whether an insured could reasonably have expected coverage." *Id.* at 865.

The reasonable-expectations doctrine does not apply here. For one, we doubt the Agreement is an adhesion contract. *See Bd. of Cnty. Comm'rs of Del. Cnty.*, 339 P.3d at 868 (explaining that contracting parties to governmental cooperative insurance plans "have substantially more freedom to contract" than

24

typical insureds). What's more, the doctrine applies to only "the construction of ambiguous insurance contracts or to contracts containing exclusions which are masked by technical or obscure language or which are hidden in policy provisions." *Max True Plastering Co.*, 912 P.2d at 863. The Agreement meets neither of those requirements.

Though Brown suggests that the court's interpretation of the sexual-abuse provisions "create[s] [an] ambiguity," she never identifies a single policy term or provision as ambiguous. *See* Reply Br. at 10. Nor are the policy's exclusions masked by technical language or hidden within the Agreement. *See Max True Plastering Co.*, 912 P.2d at 863. Instead, in no uncertain terms, the Agreement disclaims coverage for county employees who engage in sexual abuse. Simply put, Brown gives us no reason to apply the reasonable-expectations doctrine here.

As for Brown's argument that the Agreement's sexual-abuse coverage is illusory, "[p]arties are free to contract for insurance that covers whatever risks they see fit." *Crown Energy*, 511 P.3d at 1068. The counties and the Group determined for themselves that the Agreement would not cover damages caused by employees engaging in sexual abuse. And we may not rewrite the Agreement to say otherwise. *See id.*

Plus, the Agreement's coverage for sexual-abuse claims is not illusory as Brown argues. Instead, by removing acts of Sexual Abuse from the Scope of Duties, the Agreement declines coverage to *employees* who engage in sexual

25

conduct. Still, the Agreement provides the *counties* with some coverage for sexual-abuse claims. Indeed, the Agreement covers sexual-abuse claims against a county unless there is a final adjudication or admission that the county (1) "participated in the Sexual Abuse" or (2) "had knowledge of the Sexual Abuse and failed to" stop it. App. vol. I at 115. As a result, Brown has not shown that the Agreement "exclude[s] 100% of sexual misconduct claims."[13] Op. Br. at 21.

In sum, the district court's reading of the Agreement was not against the contracting parties' reasonable expectations, nor did it render the Agreement's coverage illusory.

* * *

We conclude that the Group was not required to indemnify Flowers against Brown's judgment. The district court did not err in denying the writ of garnishment.

---

[13] To the extent that Brown argues that the sexual-abuse exclusion is ambiguous because it conflicts with other provisions in the Agreement, *see Haworth v. Jantzen*, 172 P.3d 193, 197 (Okla. 2006) (finding ambiguity in "apparent contradiction" of two exclusions), this argument fails because the Agreement's sexual-abuse coverage and sexual-abuse exclusions do not conflict.

## CONCLUSION

For these reasons, we affirm the district court's denial of the writ of garnishment.

Entered for the Court

Gregory A. Phillips
Circuit Judge